**IN THE COURT OF APPEALS OF IOWA**

No. 24-1554
Filed February 5, 2025

**IN THE INTEREST OF N.J., L.M., and J.M.,**
**Minor Children,**

**D.L., Mother,**
        Appellant,

**C.M., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block,

Judge.


        A mother and father separately appeal the termination of parental rights to

their children.  **AFFIRMED ON BOTH APPEALS.**


        Luke C. Jenson of Jenson Law Firm, PLC, Waterloo, for appellant mother.

        Joseph G. Martin, Cedar Falls, for appellant father.

        Brenna Bird, Attorney General, and Natalie Hedberg, Assistant Attorney

General, for appellee State.

        Tammy L. Banning of the Waterloo Juvenile Public Defender Office,

Waterloo, attorney and guardian ad litem for minor children.


        Considered by Greer, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

A mother appeals the termination of her parental rights to her three children: N.J., L.M., and J.M., born in 2017, 2020, and 2022. The father of L.M. and J.M. separately appeals the termination of his parental rights, and N.J's father is deceased. Finding the mother's arguments generally thwarted by the existence of a five-year no-contact order, we affirm the termination of her parental rights. We also find neither L.M. nor J.M. can safely return to the father's custody and additional time was not warranted, so we affirm termination of the father's parental rights.

## I.     Background Facts and Proceedings

This family came to the attention of the Iowa Department of Health and Human Services (HHS) in February 2023. The father was working full time to support the family, while the mother—who was pregnant—stayed home with the three children. N.J. was then five years old, L.M. was two years old, and J.M. was eight months old. L.M., who had been born twenty-three weeks early, had spent the first two years of her life in a neonatal intensive care unit and then at a center specializing in children with developmental delays, returning to her parents, older sibling, and infant sibling in October 2022. L.M. has complex medical needs requiring 24/7 care. And the mother did not know how to meet those needs. As she later explained, she had postpartum depression and was overwhelmed caring for a five-year-old, a two-year-old with complicated medical needs, and an eight-month-old, all while pregnant. In the mother's words: "I did something that I never thought I could do to any of my children no matter how overwhelmed or stressed I got"—she shook L.M.

L.M. was admitted to the hospital with pneumonia or aspiration; an open pressure ulcer; bruising to the face, back, and extremities; and several hematomas. Her injuries were "unexplained and presumed to be non-accidental." L.M. had missing and matted hair upon her admission to the hospital and "appear[ed] to be malnourished/extremely underweight" despite a feeding tube. The court ordered the emergency removal of all three children from the parents' care. Although the parents initially claimed L.M. was injured during a seizure, the mother eventually pled guilty to child endangerment causing bodily injury. The father seems to have accepted or acknowledged what the mother did to L.M. around the time the mother pled guilty.

The father had visitation with all three children, which he attended at first, but then missed many visits in early 2024 before reengaging. The mother gave birth to A.M. in summer 2023, and that child was placed with the father. As time passed, N.J. began refusing to attend some visits with the father. A friend moved in and appeared to be the baby's primary caregiver, even when the father was home. The family services worker noted a need to physically intervene when the children visited the father and baby, either to redirect L.M. or J.M. or to move the baby to a different part of the room because the father was not adequately supervising all four children. The father struggled to schedule or attend medical and therapy appointments for L.M., whose complex medical needs and developmental delays required frequent doctor appointments around the state and regular physical-, occupational-, speech-, and food-therapy appointments. The family services worker who usually supervised visits opined that, while the baby

was doing fine with the father and his friend, the worker did not believe the father "would be capable of watching even a single more child."

The mother testified at the termination trial about her efforts. She relayed that her therapy focused on her postpartum depression, what she had done to L.M. and why, and how to prevent similar actions in the future. Although a temporary no-contact order was modified to allow supervised visits in late 2023, the five-year no-contact order flowing from her child-endangerment conviction blocked all contact between the mother and the children. She had been trying to obtain a modification of the permanent order to allow supervised visitation but, as of trial, the order had not been modified. The mother testified she could help the father with scheduling appointments for the baby, had been reminding him of appointments, and was trying to help financially.

The children have been in several placements over the years. They spent some time with a cousin, the paternal grandmother and great-grandparents, then moved to the maternal grandmother, then to maternal great-grandparents, and finally into foster care. Tragically, the maternal grandmother, paternal great-grandparents, and maternal great-grandfather all passed away in consecutive months at the end of 2023 and early 2024, prompting several of the shifts in placements. When L.M. moved into foster care, the father refused to sign consents to provide information from her medical records to the foster parents and new medical-supply providers, and the mother deferred to the father's decision, resulting in the court granting HHS decision-making power to ensure L.M. received necessary medical care and treatment. As of trial, L.M. was in a different foster placement than her siblings because N.J. and J.M. moved to a new family when

J.M. displayed "physically aggressive" behavior toward a family pet and interfered with L.M.'s feeding tube.

The parents' relationship was off and on over the course of HHS's involvement. Leading up to trial, neither parent disclosed to HHS whether they were still together. The mother described it as "trying to coparent for the sake of the kids," but that they needed to coparent first and fix themselves before worrying about the relationship. At trial the father testified, "It's more of a friendship right now," but "it's probably for the best that we don't get together anymore."

The social worker noted the mother "has been very appropriate," "very open to communicating," and showed "an active interest in what's going on with her kids even though she's not able to see them all the time." The social worker agreed the mother had "really bad postpartum" depression which she had been working on with a therapist, but the social worker also had some concerns when the mother switched to an online therapy application several months before the termination trial without telling HHS. And the social worker agreed there were no additional services the mother could participate in given the no-contact order. Meanwhile, the father's behavior with the worker "ha[d] been very hot and cold"—at times having productive conversations and others where he would be defensive and argumentative. The father started recording their conversations and accused the worker of "lying, not doing [her] job, not being responsive, not helping."

The juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(g), (i), (f) (as to N.J. and L.M.), and (h) (as to J.M.) (2024), and the father's rights under paragraphs (i), (f) (as to L.M.), and (h) (as to J.M.). The

parents separately appeal, and we review de novo. *See In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012).

## II. The Mother's Appeal.

The mother raises two issues on appeal relating to the statutory grounds for termination and requests additional time.

**Statutory Grounds.** "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *Id.* at 774. We hold the mother's parental rights were properly terminated under Iowa Code section 232.116(f) and (h) and thus decline to reach the mother's arguments about injuries because it only relates to paragraph (i). The grounds in (f) and (h) are similar, and the mother only challenges the final element of each: whether clear and convincing evidence established the children could not be returned to the custody of the parents as of trial. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). At the time of the trial, the mother was barred from contact with all three children under a criminal no-contact order that would not expire until 2029. The children clearly could not return to her custody as of the trial date. Instead, the mother argues they could return to the father. But "each parent's parental rights are separate adjudications, both factually and legally," and the mother has no standing to contest termination of the father's rights. *In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020). At best, the father regaining custody of the children would make possible the application of an exception to termination under section 232.116(3)(a). The grounds for termination were established by clear and convincing evidence under 232.116(1)(f) and (h).

**Additional Time.** The mother also asserts the court should have deferred permanency by six months. In order to do so, the court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child . . . will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). And, if her no-contact order were expiring soon, we might be inclined to consider the mother's argument given her general cooperation with HHS and efforts to address her deficits. But at the time of trial, the mother was barred from contact with all three children for more than four more years. We cannot, under these circumstances, find the children could return to her custody at the end of an additional six months. We affirm the juvenile court's ruling as to the mother.

### III.    The Father's Appeal

The father also contests the statutory grounds and requests additional time.

**Statutory Grounds.** The father contests termination under section 232.116(1)(f) and (h), challenging the juvenile court's finding the children could not be returned to his custody at the time of trial. He further argues paragraph (i) related to the actions of the mother toward L.M. and should not have applied to the father or J.M., and he further urges even under a neglect standard there was no evidence of risk of imminent harm. He later notes that, even if L.M. cannot be safely returned to him, J.M. does not require the same high level of medical care and could more easily return to his custody. As with the mother, we will address only termination under paragraphs (f) and (h). *See A.B.*, 815 N.W.2d at 774.

At the time of the termination trial, the father's visits were still fully supervised. *See In re L.H.*, 13 N.W.3d 627, 629 (Iowa Ct. App. 2024) ("[H]e never

progressed beyond fully-supervised visits, which also prevented an immediate return of custody."). He has refused to sign medical releases needed to ensure L.M. receives necessary medical treatment and did not communicate well with workers. At many of his visits, he brought along his friend to help supervise and would video-call with his mother, resulting in a lack of necessary attention to supervise four active children on his own and requiring intervention by the supervising worker to ensure the children's safety. He has not shown the ability to schedule, plan for, and attend the appointments for L.M.; and J.M. is now being scheduled for therapy for developmental delays, as well. While the father has an excellent support network, he already relies heavily upon it to help him care for the baby, who is by all appearances a healthy child with no special needs. Notably, the family services worker who had been supervising the father's visits for eighteen months thought that, even with all the family support, the father was not capable of watching even a single additional child full time. We find the State has established by clear and convincing grounds neither L.M. nor J.M. could be returned to the father's custody at the time of trial.

**Additional Time.** The father next argues that even if the children could not immediately return to his custody, the court should have granted him additional time to achieve reunification. He did not identify any factors, conditions, or behavioral changes he would make during the extension period, other than his mother possibly moving from Texas and being able to take charge of L.M.'s care. *See* Iowa Code § 232.104(2)(b). Instead, at trial—as he had over the prior year and a half—he attempted to deflect blame for his lack of follow through on the workers trying to help him and being argumentative with criticisms rather than

trying to correct the problems.  We affirm the juvenile court's denial of his request for more time.

**AFFIRMED ON BOTH APPEALS.**